IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 05-00503-05 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION TO SUPPRESS |
| vs. | ) | EVIDENCE FROM SEARCHES |
| | ) | CONDUCTED DECEMBER 1 |
| COREY KEONI SILVA, aka "Oni", | ) | AND 2, 2005 |
| aka "Keoni", | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
FROM SEARCHES CONDUCTED DECEMBER 1 AND 2, 2005

I.  INTRODUCTION

Defendant Corey Keoni Silva ("Silva") seeks an order suppressing

evidence obtained as a result of searches conducted on December 1 and 2, 2005.

Silva was arrested in Honolulu on December 1, 2005, after crashing the vehicle he

was driving into a City bus while fleeing from arrest.  On that date, law

enforcement officials conducted a search incident to arrest.  In addition, various

items located in the vehicle Silva was driving, including a locked Travel Pro duffel

bag, were removed and taken to the Drug Enforcement Administration ("DEA")

office located in Honolulu.   On December 2, 2005, DEA agents sought, obtained,

and executed a search warrant on the Travel Pro bag.

On October 20 and 27, 2006, the court received oral testimony from:

DEA Special Agents Matthew Rumschlag, Daria Lupacchino, Pat Piciano and

James Yuen; Honolulu Police Department ("HPD") Officer Gordon Gomes;

Corinna Callahan; Daniel Sylva; Honolulu Fireman Frank Johnson; and Rodrigo

Liberato.  After reviewing Silva's motion, the supporting and opposing

memoranda, the testimony of the witnesses, and the arguments of counsel, the court

DENIES the motion to suppress.

## II. BACKGROUND

A.   Silva's Arrest

The DEA began investigating a drug distribution conspiracy headed

by Carlos Martinez in July 2005.  Between July and October 2005, the DEA

gathered evidence from confidential sources and conducted surveillance, and then

received court-ordered authorization for a wiretap on Martinez's cell phone on

October 11, 2005.  Several conversations were intercepted between Martinez and

an individual the government identified as "Oni."[1]  Some of the intercepted calls

---

[1] According to the DEA wiretap linesheets, the calls originated from cellular number 808-

(continued...)

related to a scheduled meeting between "Oni" and Martinez on October 17, 2005

at TJ's Sports Bar near downtown Honolulu.  HPD Sgt. Gordon Gomes ("Gomes")

conducted surveillance of the meeting and observed an individual arrive in a white

Honda.[2]  This individual parked in TJ's lot next to Martinez's truck, exited the

white Honda, and entered Martinez's truck.[3]  After the meeting, while the white

Honda was driving away, Gomes was able to record the vehicle's license plate,

and subsequently determined that it was registered to Chad Ke-a.  Further

investigation led law enforcement officials to Chad's brother, Charles Keoni Ke-a

("Ke-a").[4]  On November 22, 2005, Ke-a was indicted by a grand jury.  Gomes and

other law enforcement agents, however, were not confident that Ke-a was the same

"Oni" heard on the intercepts, and thus continued their investigation.[5]

_____

[1](...continued)
352-8349, registered to Brandon Parlett.  Exs. F, G, H.

[2] This vehicle will be referred to in this Order as the "white Honda."  Another Honda enters the story later, and will be referred to as the "green Honda."

[3] Gomes testified that although he saw an individual arrive in a white Honda, exit the vehicle, and enter Martinez's truck, he was unable to observe any characteristics of the male. Gomes's ability to identify the individual was limited to a description of a "local Caucasian male" with average height and medium build.  His limited ability to observe was attributed to the distance he maintained between himself and the white Honda, and because it was dark and rainy at the time of the meeting.

[4] "Oni" is often used in Hawaii as shorthand for the name "Keoni."

[5] Ke-a, although indicted, was never arrested by law enforcement.

3

Surveillance was conducted at Ke-a's residence, but law enforcement did not observe the white Honda parked in the area.   Gomes testified that he then spoke to an informant and was told that a different "Oni" -- Corey Keoni Silva -- was a drug dealer living in the Kalihi area of Honolulu.   After determining that Silva was linked to a home at 1917 Ahuula Street, Gomes conducted surveillance at that address and observed the white Honda parked on the grass of the property adjacent to the driveway.   Also parked on the property was a truck with the license plate "ONZ4X4," which apparently translates to "Oni's 4x4."   Based on the license plates of other cars parked at the house, Gomes learned that Silva's family members lived at 1917 Ahuula Street.

One of the vehicles parked at 1917 Ahuula Street was registered to Chassidy Qualye, Silva's ex-girlfriend and the mother of his children.   Quayle listened to the intercepted phone call setting up the October 17 meeting with Martinez at TJ's, and identified Silva's voice as "Oni."   DEA Special Agent Matt Rumschlag also determined that the phone number registered to Brandon Parlett (808-352-8349) made several calls to the 1917 Ahuula Street address.[6]

---

[6] Specifically, Ex. K demonstrates that from October 7, 2005 through October 12, 2005, twelve calls were made from 808-352-8349 to 808-330-8904, a phone registered to Conrad Silva at 1917 Ahuula Street.  Further, between September 30 and October 22, 2005, twelve calls were made from the Ahuula Street phone to 808-352-8349.   The same exhibit also shows that two

(continued...)

The government sought an arrest warrant for Silva on November 30, 2005, which was signed by Magistrate Judge Barry M. Kurren.  In support, the United States submitted a criminal complaint and affidavit prepared by DEA Special Agent Daria Lupacchino ("Lupacchino").  Lupacchino's affidavit did not mention that Ke-a had previously been indicted, or that the government no longer believed that he was the "Oni" on the intercepts who met with Martinez on October 17, 2005.  During a *Franks* hearing, Lupacchino explained that within the span of a few days (between November 25 and 29, 2005), the government realized that Ke-a was the wrong suspect.[7]  The government learned that Silva may have been on the run and the government therefore sought an arrest warrant quickly to prevent Silva from fleeing.

Silva was arrested on December 1, 2005 pursuant to the arrest warrant.  Special Agent Rumschlag first observed Silva in a green Honda registered to Corinna Callahan in the parking lot of a condominium in a residential

---

[6](...continued)
phones registered to Chad Ke-a were used for incoming/outgoing calls to 808-352-8349.

[7] Lupacchino testified to the same sequence of events as set forth above.  Not observing the white Honda at Ke-a's residence, she believed that the agents had identified the wrong "Oni." In a short time span, the agents learned of Silva through Gomes' informant, observed the white Honda at Silva's residence located at 1917 Ahuula Street, observed the truck with the license plate ONZ4X4, learned from toll records that calls were made from the Parlett phone to 1917 Ahuula Street, and had Qualye, the mother of Silva's children, identify Silva's voice on the wiretap intercepts.

area of Honolulu.  Rumschlag approached the green Honda, observing Silva in the

driver's seat.  Rodrigo Liberato was in the front seat and Chelsea Banisihan was in

the back.  As Rumschlag approached, the green Honda fled, requiring Rumschlag

to move out of its path.  As it fled, the green Honda was observed on the wrong

side of the street hitting vehicles parked on the curb.  While attempting to elude

law enforcement officials at a high rate of speed, Silva crashed into a City bus

driven by Daniel Sylva.  By all accounts, the accident was serious, requiring the

"jaws of life" to extricate Silva from the green Honda.  Silva, Liberato, Banisihan

and Sylva (the bus driver) were injured and treated at the scene by emergency

medical personnel and then transported to Queen's Hospital.  At the hospital, Silva

(the defendant) and Sylva (the bus driver) were placed in the same room.  Special

Agent Rumschlag traveled with Silva in the ambulance and remained in his room

at the hospital that evening.

B.    Searches Conducted December 1 and 2, 2005

        After the emergency personnel completed their work, DEA Agents

searched Silva incident to his arrest and removed several items from the passenger

compartment and trunk of the green Honda.  The items taken from the car were

transported to the DEA office and stored in a locked closet.  One of the items

taken from the trunk was a black Travel Pro bag secured by several locks.  The

following day, December 2, 2005, Lupacchino submitted an affidavit in support of

an application for a search warrant for the Travel Pro bag, which was authorized

by Magistrate Judge Kevin S.C. Chang that day.  DEA agents then cut the locks

off the bag, and found $319,560 packed into three small boxes.

Silva now seeks an order suppressing all items seized from his person

and from the green Honda he was driving at the time of his arrest on December 1,

2005.  Silva argues the fruits of the searches should be suppressed because:

(1) the arrest warrant was invalid because the Lupacchino Affidavit contained

knowing and substantial material omissions and relied on illegally obtained

wiretap evidence; (2) that absent a valid arrest warrant, the search of Silva's

person and car violated the Fourth Amendment;[8] and (3) the Travel Pro bag was

unlawfully searched on December 1, 2005, and, in any event, the warrant to search

the Travel Pro bag was not supported by probable cause.   The United States, in

turn, argues that Silva does not have standing to challenge the searches, and that,

---

[8] In his motion to suppress, Silva does not challenge the legality of the search incident to arrest; instead, he argues that the December 1, 2005 search incident to arrest constitutes the fruit of an illegal arrest.  Thus, in his initial motion, Silva's challenge to the December 1 search was limited to his claim that the search was unlawful because the arrest warrant was deficient.  In his reply memorandum, Silva suggests for the first time that items in the vehicle could not be searched incident to arrest even if the arrest warrant was valid.  Neither party offered evidence during the hearing that provided the court with any basis to rule on the validity of the search incident to arrest.  As this was raised by Silva for the first time in his reply memorandum, the court declines to consider the issue at this time. *See United States v. English*, 92 F.3d 909 (9th Cir. 1996).

even if he did have standing, the arrest warrant did not contain material omissions, the Travel Pro bag was not "pre-searched," and the search of the Travel Pro bag was supported by probable cause.

## III.  ANALYSIS

A.    Silva Has Standing to Challenge the Searches

In order to contest the validity of a search, "the defendant must establish that he or she had a 'legitimate expectation of privacy' in the place searched or in the property seized."  *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978)).  Thus, a defendant has the burden of proving that he manifested a subjective expectation of privacy in the area searched and that the expectation is one that society recognizes as objectively reasonable.  *United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999).

"Because Fourth Amendment rights are personal and may not be vicariously asserted, as a general rule, only the owner of the vehicle or an individual with a legitimate privacy interest in the vehicle may challenge an allegedly illegal search."  *United States v. Wanless*, 882 F.2d 1459, 1462 (9th Cir. 1989) (citation omitted).  A driver has a legitimate expectation of privacy in a vehicle he does not own if he operates it with the permission of the rightful owner.  *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980) (finding a legitimate

8

expectation of privacy where the defendant was in possession of the car, had the

permission of the owner, had a key to the car and had the right to exclude all

others, except the owner, from the car).  Likewise, an unauthorized driver of a

rental vehicle "may have standing to challenge a search if he or she has received

permission to use the car" from the authorized driver.  *United States v. Thomas*,

447 F.3d 1191, 1199 (9th Cir. 2006) (adopting Eighth Circuit approach, reasoning

that an unauthorized driver has standing upon a showing of "consensual

possession" of the rental car); *see also United States v. Valdez Hocker*, 333 F.3d

1206 (10th Cir. 2003); *United States v. Baker*, 221 F.3d 438 (3d Cir. 2000); *United

States v. Angulo-Fernandez*, 53 F.3d 1177 (10th Cir. 1995).

       Corinna Callahan, the registered owner of the green Honda, testified

that she grew up with Silva, describing him as a long-time friend.  In the summer

of 2005, Callahan and Silva traded vehicles -- Callahan gave her truck to Silva and

Silva gave the green Honda to Callahan.  Callahan then became concerned that the

green Honda was stolen, or had stolen parts, and asked Silva to take the car in

August or September 2005 so that he could look into her concerns about the

vehicle.  Callahan testified that she neither gave Silva explicit permission to use

the green Honda nor placed any limits on his authority over the car.  Callahan did

not restrict Silva's use of the car or request that he return it by a specific date. According to Callahan, "nothing was structured."

On Thanksgiving day, Silva told Callahan that Liberato would be returning the car that night; in fact, he did not. Callahan expressed no concern, explaining that Silva had been her friend for a long time. In fact, she testified that she was "okay" with Silva having the car after Thanksgiving.

Silva provided a declaration consistent with Callahan's testimony. In it, Silva asserts that he gave Callahan the green Honda in a trade for her pickup truck and that he took the green Honda back from Callahan in order to find out if it was stolen or to trade it for another car. Silva Decl. at ¶¶ 3, 4, 5. He states that he talked to Callahan about returning the car to her, but was in no rush to do so because he knew she always had a ride with her boyfriend. Silva Decl. at ¶¶ 6, 7.

Silva argues that he had permission, albeit implicit permission only, to use the green Honda and thus has satisfied his burden to prove standing. The government claims that absent proof of explicit permission to use the vehicle for personal use, Silva has not met his burden. Although close, the court ultimately agrees with Silva.

Callahan's testimony established implied permission for Silva to use the green Honda. "Legitimation of expectations of privacy by law must have a

source outside of the Fourth Amendment, either by reference to concepts of real or

personal property law or to understandings that are recognized and permitted by

society." *Rakas v. Illinois*, 439 U.S. 128, 142 n.12 (1978).  Under the unique

circumstances of this case, including the close relationship between Silva and

Callahan, and given that Silva previously owned the vehicle, traded vehicles with

Callahan, and then had the vehicle returned to him without specific limitations, the

court finds that Silva's subjective expectation of privacy in the vehicle is one that

society is prepared to recognize as reasonable.  *See United States v. Baker*, 221

F.3d 438 (3d Cir. 2000) (finding a reasonable expectation of privacy in borrowed

car where defendant had keys to the car and control over car for weeks).  The

testimony established that Callahan had no expectations that Silva would return

the green Honda at any particular time, and Silva had no reason to believe that he

had a date certain to return the car or that he could not use the car.  The

government's argument -- that permission must be explicit -- asks too much.  To

adopt this position would undermine the Supreme Court's admonition that courts

should consider "understandings that are recognized and permitted by society."

Although explicit permission to borrow or use a car is certainly one method to

prove an expectation of privacy, it is not the sole method.  To require long-time

friends to state explicitly their understanding, when their friendship does not

require such explicit conversation, is not required to establish standing.  Given the

totality of the circumstances, the court finds that Silva has established a reasonable

expectation of privacy in the green Honda.

Silva also has standing to challenge the December 2, 2005 search of

the locked Travel Pro bag.  Silva asserts in his declaration that he had the bag for

about three months, that he locked the bag with the money in it and had placed it

in the trunk of the green Honda.  Silva Decl. at ¶¶ 10, 12.  Liberato twice testified

regarding the locked bag, and both times identified it as belonging to Silva.

Liberato explained that it served as "the money bag" and that he and Silva

transferred it from another vehicle into the trunk of the green Honda, where it was

found on the day of their arrest.  The court concludes that Silva had a legitimate

expectation of privacy in the Travel Pro bag.

Silva, therefore, has standing to challenge the December 1, 2005

search of the green Honda and the December 2, 2005 search of the locked Travel

Pro bag.

B.    The Arrest Warrant Is Not Defective

Silva claims the fruits of the December 1, 2005 searches should be

suppressed because:  (1) the arrest warrant was invalid; and (2) that absent a valid

arrest warrant, the search of Silva's person and car violated the Fourth

Amendment.  The court disagrees.

Silva argues that the search warrant was defective because (1) the fact

that a different "Oni" (Charles Keoni Ke-a) had been indicted was concealed from

the issuing Magistrate Judge;[9] and (2) the warrant application relied on illegally

obtained wiretap evidence.[10]

"A defendant seeking an evidentiary hearing to determine whether a

facially valid affidavit contains false statements must make a substantial

preliminary showing that:  (1) the affidavit contains intentionally or recklessly

false statements and (2) the affidavit cannot support a finding of probable cause

---

[9] Silva's motion also claims that: 1) the affidavit provided no explanation "as to how HPD identified Silva as the person who emerged from the Honda registered to Chad A. Ke-a [on October 17, 2005 at TJ's] and it concealed the fact that previously this person was apparently identified as Charles Ke-a;" and 2) the affidavit "described Silva as a 'frequent multi-pound customer' of Martinez . . . when the DEA had no hard evidence that drugs in any quantity ever actually changed hands between Martinez and Silva."  Silva's Motion at 8.  Both arguments lack any merit.  First, as described *supra*, Gomes credibly testified that in fact he did not identify the individual emerging from the white Honda at TJ's.  Thus, there was no previous identification of Ke-a as the individual meeting Martinez on October 17.  Second, the claim that the affidavit falsified Silva's role as a multi-pound customer is mystifying.  The affidavit sets forth the clear basis for these statements based on two conversations between "Oni" and Martinez.  On the first occasion, "Oni" asked Martinez if he got "five," after which Martinez asked "five pounds?"  Affidavit at ¶ 9.  On the second occasion, Martinez told "Oni" that while on the mainland he would send "Oni" like ten (10) or more," to which "Oni" replied, "Ok, my man."

[10] The court has already addressed the second point.  On October 10, 2006, the court denied Silva's Motion to Suppress Wiretap Evidence (Doc. No. 126), finding that the affidavit satisfies the necessity requirement as outlined in 18 U.S.C. §§ 2518(1)(c) and 2518(3).

without the allegedly false information." *United States v. DeLeon*, 979 F.2d 761,

763 (9th Cir. 1992) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).  *Franks*

also applies to "omissions of material facts."  *DeLeon*, 979 F.2d at 763 (citing

*United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985)).  Silva sought and was

granted a *Franks* hearing based on his preliminary showing that the grand jury

indicted Ke-a as "Oni," and yet the affidavit in support of Silva's arrest warrant

did not mention law enforcement's (and the grand jury's)  previous belief that

Ke-a, and not Silva, was the "Oni" intercepted during the wiretap.

A *Franks* hearing requires a district court to engage in a two-part

process:

> First, the district court determines whether the affiant officer
> intentionally or recklessly made false or misleading statements
> or omissions in support of the warrant.  If it finds by a
> preponderance of the evidence that the officer so acted, the
> district court then inquires into whether . . . the affidavit's
> remaining content is insufficient to establish probable cause.

*United States v. Martinez-Garcia*, 397 F.3d 1205, 1214-15 (9th Cir. 2005)

(citations and quotation signals omitted).  Silva argues that the failure to include

the Ke-a investigation and indictment in Lupacchino's affidavit in support of the

arrest warrant is a reckless omission.  The court disagrees.

14

The criminal complaint alleges that Silva conspired to distribute 500 or more grams of methamphetamine between October 13 and November 11, 2005. According to Lupacchino's affidavit, the DEA identified Martinez as the leader of the conspiracy, and identified Silva, through the intercepted phone conversations, as a customer who purchased "multi-ounce" and "multi-pound" quantities of crystal methamphetamine from Martinez.  The affidavit also discusses the October 17, 2005 meeting at TJ's between Martinez and Silva; because Martinez's cell phone was left on, intercepts during the meeting recorded their conversation.  The affidavit states that, during the meeting, Silva asked Martinez to call him when he got "five pounds," and that after the meeting, the white Honda was spotted at the Ahuula Street address and that Chassidy Quayle identified Silva's voice on the recordings.

Although the affidavit does not mention that Ke-a had previously been indicted, or that the government no longer believed he was the target "Oni," the omission was not reckless.  Lupacchino testified that the government knew a mistake had been made (that is, that Ke-a was not the right suspect), but that she did not think she needed to put this information in the probable cause section of her affidavit.  Lupacchino explained that, within just a few days, the government realized that Ke-a was the wrong suspect, and law enforcement turned their

15

attention to finding the true "Oni."  Lupacchino's testimony was consistent with

Gomes's and Rumschlag's testimony regarding the investigation's shift in focus

from Ke-a to Silva, and that substantial information was gathered showing that

Silva, not Ke-a, was the "Oni" intercepted on the wiretap.  She also testified that

she did not leave out the information in order to mislead the magistrate judge, and

did not believe that leaving the information out would affect the probable cause

determination.   In other words, according to Lupacchino, a mistake had been

made and corrected, and the fact of the mistake did not impact the quantity or

quality of evidence gathered against Silva.

　　　　　　The court finds the agents' testimony concerning the evolution of the

investigation to be credible and concludes that the affidavit does not contain

recklessly false statements or omissions.  At most, the failure to include the Ke-a

indictment in the affidavit was merely a mistake, which is not sufficient under

*Franks*.  *Franks*, 438 U.S. at 171.

　　　　　　Because Silva has not met his burden with respect to the first prong of

the *Franks* inquiry, the court is not required to decide whether he has

demonstrated that the omission was material to the finding of probable cause.

*Martinez-Garcia*, 397 F.3d at 1215.  Nevertheless, the court notes that the omitted

facts were immaterial to the issue of probable cause.  "In determining materiality,

16

the pivotal question is whether an affidavit containing the omitted material would have provided a basis for a finding of probable cause." *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002) (citation and quotation marks omitted). The omission of the Ke-a indictment is immaterial; the supporting affidavit listed a significant amount of evidence and established probable cause for the issuance of the arrest warrant. Even if the affidavit had included the Ke-a information, "the shadow of suspicion cast upon [Silva] would remain" *id.*, because the affidavit related that the white Honda from the October 17 meeting was seen at the Ahuula Street address associated with Silva and that his recorded voice was identified by Quayle. *Cf. id.* ("The omission of the second vehicle is immaterial because the DEA observed the vehicle and determined that its occupants were not [the co-defendant's] likely supplier."). "As the magistrate could have found probable cause even with mention of the [Ke-a indictment] in the affidavit, its omission from the affidavit was not material." *Id.*

C.   The Search of the Travel Pro Bag was Lawful

Silva argues that the warrant to search the Travel Pro bag was invalid for two reasons. First, he argues that the agents opened the bag without a warrant prior to December 2, and therefore the fruits of the later search must be suppressed. Second, he argues that the affidavit in support of the search warrant

fails to establish probable cause.  The government claims that the bag was not searched prior to the execution of the warrant, and that the affidavit in support of the warrant, although not perfect, establishes probable cause.  The government further argues that even if the affidavit lacks probable cause, the evidence should not be suppressed under the good faith exception to the exclusionary rule.

> **1.    Law Enforcement did not Open or Otherwise Search the Travel Pro Duffel Bag Prior to the Execution of the Search Warrant**

Silva claims that the bag was first opened by law enforcement officials on December 1 (before the warrant was issued).  As evidence, Silva relies on the testimony of the bus driver, Daniel Sylva.  Sylva testified that he lost feeling in his legs following the collision, was extracted from the bus, and transported to the hospital in the same ambulance as Silva.  According to Sylva, both were put in the same hospital room, with a curtain drawn between the two men.  He testified that approximately fifteen minutes after arrival at the hospital, uniformed HPD officers spoke to him and then went to Silva's side of the curtain, where he lost sight of them.  Sylva testified that although he could not see them, he heard a police officer tell Silva that they found guns, drugs, jewelry and money in the trunk of the car.  Specifically, Sylva recalled hearing someone say that roughly $300,000 was found.

Sylva's testimony is at odds with Special Agent Rumschlag's recounting of events at the hospital. Although Sylva testified that an HPD officer spoke to the Defendant, Rumschlag credibly testified that no such conversation occurred. Rumschlag explained that he accompanied Silva to the hospital in the ambulance and stayed with him in the emergency room at the hospital. Once at the hospital, Silva was complaining loudly of pain and was medically sedated, while Rumschlag was standing approximately ten to fifteen feet away in the doorway of the room. According to Rumschlag, after Silva was sedated he was not able to speak to anyone. Rumschlag credibly testified that he did not leave Silva's room, Silva was sedated the entire time, no HPD officer spoke to Silva the night of December 2, and that the conversation that bus driver Sylva claims to have overheard did not happen.

Rumshlag's testimony is consistent with the HPD Motor Vehicle Accident Report dated December 2, 2005 ("Ex. M"). The accident report, signed by Officer R. Tsunezumi, states that the officer went to the hospital at 7:30 pm on December 1, 2005, and that Silva was unconscious, having been sedated. Ex. M. The report further says that the officer was unable to obtain a statement from Silva. *Id.* Both Rumschlag's testimony and the HPD report contradict Sylva's

testimony that an HPD officer told Silva that $300,000 had been found in the trunk.

Lupacchino testified that the items found in the vehicle after the accident, including the Travel Pro bag, were collected and transported to DEA's Honolulu district office where they remained in a locked closet. She further explained that the locks remained on the bag until the warrant was executed on December 2, 2005. Special Agent Pat Piciano ("Piciano") also testified that the locked bag was taken to the DEA office and secured on the night of December 1, 2005. DEA Supervisor James Yuen ("Yuen") testified that the bag had not been opened prior to the issuance of the search warrant on December 2, 2005; he explained that the locks were secure and that in order to execute the warrant he had to cut them off with bolt cutters.

Based on the credible testimony of Rumschlag, Lupacchino, Piciano, and Yuen, as well as a review of the HPD report, the court concludes that the Travel Pro bag was not first opened without a warrant; it was first opened on December 2 pursuant to a court-authorized warrant. Although it is unclear to the court why Sylva testified to the alleged statement made to Silva at the hospital, the court notes that he was recollecting events following a traumatic event, was in pain at the time, and did not appear to be accurate in all details of his testimony.

20

The court thus does not credit Sylva's testimony that an HPD officer told Silva that they had located $300,000.  The court next turns to Silva's contention that the search warrant was not supported by probable cause.

### 2.    The Search Warrant Was Supported by Probable Cause

The Lupacchino affidavit in support of the search warrant for the Travel Pro bag, as admitted by the government, is not without its problems.  Most strikingly, the affidavit appears to contain boilerplate language referencing the search of a residence, not of a vehicle.  Once getting past this boilerplate language, however, the affidavit does discuss in some degree of detail the events on and prior to December 1, 2005.

The affidavit contains detail concerning the wiretap investigation, including intercepts disclosing that "Martinez supplied multi-ounces and multi-pounds of crystal methamphetamine to several Hawaiian-based customers.  One of these customers was subsequently identified as Cory 'Keoni' SILVA . . . ."  Lupacchino Affidavit at ¶ 14.  The affidavit also discusses the issuance of the criminal complaint and arrest warrant for Silva.

Next, the affidavit recounts the events leading up to Silva's arrest.  After learning Silva's location, surveillance was established.  Liberato, driving a Mercedes, was observed parking his car and entering a green Honda with Silva in

the driver's seat and a female in the back seat.  As agents approached the green

Honda, "Silva, upon seeing law enforcement officers, drove passed [sic] the

officers at a high rate of speed and fled from the scene in the Honda." *Id*. ¶ 14.

After the collision with the City bus, Silva was searched incident to

arrest and approximately 2.6 grams of a substance testing presumptively positive

for methamphetamine was found on his person.  Finally, the affidavit notes that

the locked Travel Pro bag was located in the trunk of the green Honda.[11]

As the Ninth Circuit has explained:

> Probable cause exists when there is a fair probability or
> substantial chance of criminal activity.  It is well-settled
> that the determination of probable cause is based upon
> the totality of the circumstances known to the officers at
> the time of the search.

*United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004) (citations and

quotation signals omitted).  Thus, to demonstrate probable cause, the government

need not *guarantee* that a search will yield evidence of a crime; instead, probable

cause requires only, based on the totality of the circumstances, that there be a *fair*

---

[11] After the emergency personnel removed the occupants of the green Honda, DEA
agents, as described *supra*, removed the items located in the green Honda and transported those
items back to the DEA Honolulu office.  Given that the vehicle was in an accident rendering it
inoperable, removing the items from the vehicle for safekeeping was clearly reasonable.
Although Silva argues (in his reply memorandum for the first time) that the DEA may have
exceeded their authority in searching incident to arrest, he has not challenged the legality of
removing the items from the vehicle and transporting them to the DEA office.

*probability* that the search will yield such results. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).[12]

The Lupacchino affidavit, read in its totality and even considering its reference to "residential" searches, contains sufficient detail to establish probable cause. The affidavit established that Martinez supplied Silva with multi-pound quantities of methamphetamine. Silva fled from law enforcement, creating a clear inference of consciousness of guilt. *See United States v. Gonzalez*, 969 F.2d 999 (11th Cir. 1992). Finally, the Travel Pro bag was found with locks, buttressing the suspicion that the bag contained contraband.

---

[12] As the Supreme Court explained:

> As early as *Locke v. United States*, 7 Cranch. 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context, that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the *quanta* . . . of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar* [*v. United States*, 338 U.S. 160, 173, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)]. Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli* [*v. United States*, 393 U.S. 410 (1969)].

*Id.* at 235 (Some alterations in original and some added.)

Even if the Lupacchino affidavit fell short of probable cause, the court would find that the search warrant was sought and executed in good faith, rendering suppression unavailable as a remedy.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court adopted what is often referred to as the "good faith" exception to the exclusionary rule.   As recently explained by the Ninth Circuit:

> The "good faith exception" applies, and suppression is unwarranted, unless the searching officers' reliance on the warrant was not "objectively reasonable," *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the magistrate judge "wholly abandoned his judicial role," *id.* at 923, 104 S.Ct. 3405, or the officers acted in bad faith by misleading the magistrate judge, *id.* (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

*United States v. Huggins*, 299 F.3d 1039, 1044 (9th Cir. 2002).

Luppachino's affidavit, if deficient, falls squarely in the good faith exception.  Reliance on the warrant, given the facts set forth in the affidavit, was clearly objectively reasonable.  Further, the court has rejected the notion that the officers acted in bad faith (by opening the Travel Pro bag prior to execution of the warrant) or misled the magistrate judge.  Therefore, even if the affidavit failed to

set forth sufficient facts to establish probable cause, the DEA agents acted in good

faith and the evidence obtained from the Travel Pro bag need not be suppressed.[13]

### IV.  CONCLUSION

For the reasons stated above, Silva's motion to suppress is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 9, 2006.



J. Michael Seabright
United States District Judge

*United States v. Silva*, Cr. No. 05-00503-05 JMS; Order Denying Defendant's Motion to
Suppress Evidence From Searches Conducted December 1 and 2, 2005

---

[13] Given these findings, the court need not reach the issue of whether the Travel Pro bag
could have been searched pursuant to the automobile exception to the warrant requirement.